<u>UNDER SEAL</u>

FILED
2017 APR -5 PM 2:38
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
BY: ___

TIMOTHY A. SCOTT
California Bar No. 215074
NICOLAS O. JIMENEZ
California Bar No. 295057
LAW OFFICES OF TIMOTHY A. SCOTT, APC
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 794-0451
Facsimile: (619) 652-9964
Email: tscott@timscottlaw.com
       noj@timscottlaw.com

Fee Paid $400.00

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America *ex rel* Rachel Perry<br><br>Plaintiffs,<br><br>vs.<br><br>Proove Biosciences, Inc.; Dr. Karim Abdollahi; Dr. William Wang; Dr. Michael J. Gillman; Does 1-10<br><br>Defendants. | Civil Action No. SACV17-00616 AG (DFMx)<br><br>*Qui Tam* Complaint for Violation of the False Claims Act<br>(31 U.S.C. § 3729 *et seq.*)<br><br>**UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**Demand for Jury Trial** |

1

COMPLAINT

## INTRODUCTION

1. Proove Biosciences markets itself as a leader in the field of medical genetic testing. It claims to have developed tests that can determine, among other things, patients' genetic risk for addiction to different medications, anomalies in how individual patients metabolize different medicines, and how efficacious different drugs might be on a patient-by-patient basis.

But Proove's real business is billing Medicare and private insurance companies for lab work that has no sound basis in medical science. And it does so by paying kickbacks to doctors to order the tests, and then falsifying documents in order to justify the kickbacks as "research fees." The result is millions of dollars of loss to taxpayers due to false claims billed to Medicare.

This whistleblower action is brought by Rachel Perry, an employee of Proove Biosciences, as a *qui tam* relator on behalf of the United States. It is brought against Defendants Proove Biosciences, Inc., Dr. Karim Abdollahi, Dr. William Wang, Dr. Michael Gillman, and Does 1-100.

Plaintiff requests a jury trial to pursue justice on these claims.

## JURISDICTION AND VENUE

2. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

3. Subject matter jurisdiction exists under the 31 U.S.C. 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

4. Venue and jurisdiction are proper pursuant to 31 U.S.C. § 3732(a) because: (i) some or all of the Defendants are located in this district; (ii) Defendants transact business in this district and did so at all times relevant to this complaint; and, as averred below, (iii) Defendants committed acts proscribed by 28 U.S.C. § 3729 within this district.

5. Venue is also proper insofar as Ms. Perry is and was a resident of Orange County at all times relevant to this lawsuit.

6. Ms. Perry has complied with all statutory conditions precedent to filing this lawsuit.

## PARTIES

7. Relator Rachel Perry is a citizen of the United States and a resident of Orange County. She has been employed at Proove Biosciences since June of 2015.

8. Defendant Proove Biosciences, Inc. is a Delaware Corporation headquartered in Irvine, California.

9. Proove routinely conducts business throughout the Central District of California and beyond.

10. Proove's agent for service of process, according to the California Secretary of State, is: Legalzoom.com, Inc., 101 N. Brand Blvd., 11th Floor, Glendale, California 91203.

11. Proove's mailing address is: 15326 Alton Parkway, Irvine, California 92618.

12. Defendant Karim Abdollahi is a physician who practices medicine in Orange County, California. His business address is 31862 Coast Highway, Suite 400, Laguna Beach, California 92651.

13. Defendant William Wang is a physician who practices medicine in Orange County, California. His business address is 31862 Coast Highway, Suite 400, Laguna Beach, California 92651.

14. Dr. Michael J. Gillman is a physician who practices medicine in Orange County, California. His business address is 31862 Coast Highway, Suite 400, Laguna Beach, California 92651.

15. Defendants 1-100 are additional doctors, employees, and co-conspirators of Proove Biosciences, Inc. who have committed and are continuing to commit the fraudulent and unlawful acts and omissions described herein.

# FACTUAL ALLEGATIONS

## I. Medicare Act and Billing.

16. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program. Medicare is a federally-funded health insurance program primarily benefiting the elderly and disabled. *See generally* 42 U.S.C. § 426 *et seq.*

17. The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

18. Medicare is funded by two trust accounts run by the U.S. Treasury: the Hospital Insurance Trust Fund and the Supplementary Medical Insurance Trust Fund. Each trust pays for different parts of Medicare. (See http://www.medicare.gov/about-us/how-medicare-is-funded/medicare-funding.html).

19. In order to qualify for reimbursement from Medicare, a healthcare provider must certify that it is in compliance with applicable statutes, rules and regulations governing the provision of care and reimbursement of claims under the Medicare program.

20. A knowingly false statement within these certifications of compliance renders a reimbursement claim false, even if the provider actually rendered the service for which it seeks reimbursement.

## II. Proove Biosciences, Inc. and co-conspirator doctors.

21. Proove Biosciences Inc. purports to be a genetic-research facility that has developed a portfolio of tests to determine, among other things, individual patients' risks and tolerances in using various drugs. Proove markets itself as a leader in genetics-based personalized medicine, and it is ranked as one of the fastest-growing tech companies in the United States.

22. Rachel Perry was hired by Proove in June of 2015 as a "research assistant."

4

COMPLAINT

23. After a period of in-house training at Proove's headquarters in Irvine, Ms. Perry was assigned to a doctor named Alexander Prattes in Orange County. She was sent to work on-site in his office, but on behalf of Proove Biosciences, in July of 2015.

24. Ms. Perry is but one of a multitude of similar Proove employees who work at doctors' offices around the country. Proove has developed relationships with a host of doctors, whereby doctors receive purported "research fees" from Proove for participation in Proove's "research studies," and Proove receives a steady stream of physicians' orders for its genetic tests. As described below, these relationships actually amount to illegal kickbacks, see 42 U.S.C. § 1320a-7b(b), and violations of the Physician Self-Referral Law (also known as the Stark law), 42 U.S.C. § 1395nn.

25. These "research assistants" work on-site at doctors' offices and interact directly with patients there. Today, after some patients objected to being part of a "research" program, Proove calls employees like Rachel Perry "Patient Engagement Representatives" or "PER's."

26. A Patient Engagement Representative's job is essentially to ensure that as many people as possible participate in Proove's genetic testing, to complete the paperwork that is necessary to bill Medicare and private insurers for these tests, and to complete false paperwork suggesting that doctors are actually performing research-related tasks (rather than simply receiving kickbacks to order these genetic tests).

27. Beginning in July of 2015 through approximately the end of June 2016, Ms. Perry witnessed this process firsthand at Dr. Prattes's office in Orange County. As time went on, Ms. Perry became aware of several different illegal schemes that Proove and its co-conspirator doctors were engaged in, including the following:

### A. "Test Add-Ons" without medical benefit.

28. In late June or early July of 2016, a supervisor at Proove, Christina Elkhoury, instructed Ms. Perry to obtain the insurance information (and/or Medicare information) for every patient at Dr. Prattes's office who had ever undergone Proove testing.

29. It was explained to Ms. Perry that Proove intended to run "test add-ons" to existing patients—that is, additional tests that Proove had developed and wanted to bill to Medicare and private insurers, or existing tests that had not yet been ordered, under the guise that the doctors wanted and/or needed these additional tests for legitimate patient care.

30. An example of correspondence related to such "test add-ons" is attached as Exhibit A.

31. It was explained that because the volume of testing and billing had diminished at Dr. Prattes's clinic recently, they needed to perform "test add-ons" to keep generating revenue.

32. It was also explained that this practice was not limited to Dr. Prattes's clinic, and was commonplace throughout the rest of Proove's referral network.

33. But the patients had not consented to the test add-ons, and they were not medically indicated. They were run only for the purpose of providing additional billing.

34. On information and belief, Proove caused "test add-ons" to be run in virtually every doctor's clinic in which it had a Patient Engagement Representative. It did so only for the purpose of generating additional billing revenue, and without any medical necessity or benefit to the patients.

### B. Illegal kickbacks to doctors for ordering Proove lab tests.

35. In July of 2016, Ms. Perry was transferred to the doctors' offices where Defendants Abdollahi, Wang, and Gillman practice. Her first day at that office was on or about July 11, 2016.

36.     On or about that same day, July 11, 2016, Ms. Perry received written instructions from a Proove Biosciences employee, Anthony Nguyen, on how to process genetic tests and paperwork for Doctors Abdollahi and Wang.[1] *See* Exhibit B. Mr. Nguyen was Ms. Perry's predecessor at Dr. Abdollahi's office. Ms. Perry replaced him after he was promoted to assistant account supervisor within the company. The memorandum that Mr. Nguyen provided is essentially a blueprint for how Proove perpetuates fraud against Medicare.

37.     Proove tries to skirt anti-kickback laws by claiming that it pays doctors as "researchers" (rather than providing kickbacks to encourage doctors to order its genetic tests). It claims that doctors are compensated for tasks such as reviewing test results with the patients. *See* Exhibit C (Physician Clinical Research Services timesheet). But the Proove memo stated explicitly that the patient engagement representative was expected to go over test results with the patient, and that *the doctor never performed this duty.*

38.     Proove also claims that doctors are being compensated for completing research surveys (called Investigator Intervention Evaluations, or IIE's) rating the efficacy of the tests on patient care. *See* Exhibit D (Sample IIE). Proove also uses the IIE's to bolster their specious claims that its genetic testing actually improves patient care.

39.     But doctors Abdollahi and Wang—and most likely the vast majority of doctors in Proove's network—do not fill out these "research findings" that are the purported basis of their compensation. As the Nguyen memo stated, *"you will fill out IIE for Dr. Abdollahi. He will sign at the end of the day."* Exhibit B. "Make

---

[1] (A different Proove Patient Engagement Representative is assigned to Dr. Gillman, but it is believed that the instructions for interacting with him were and are functionally the same.)

Case 8:17-cv-00616-MWF-SS   Document 1   Filed 04/05/17   Page 8 of 17   Page ID #:8

sure it is highlighted orange on EVERYTHING he needs to sign" the memorandum continued. *Id.*

40. Thus doctors Abdollahi and Wang, and likely others, are not being compensated for completing IIE's and related tasks; insofar as Proove employees are filling out those forms, "research fees" are merely an artifice for disguising illegal Medicare kickbacks.

41. Proove made regular payments to each of these doctors from at least July of 2016 onward.

42. Any payment made from Proove to Drs. Abdollahi, Wang, and on information and belief, Dr. Gillman and others, between July 2016 and present, is in reality an illegal kickback for ordering Proove lab tests.

43. The memo also made clear that the Proove employees who are filling out the doctors' surveys should report excellent results: "Use your best judgment based off how the patient responded to report" the memo reads. On a scale of 1-5 for benefit to the patient, the memo stated that "*I most often gave 5's [out of 5], sometimes with 4's.*" Exhibit B.

44. This mandate for Proove employees to falsify glowing reviews for its own product was consistent with instructions from the highest levels of management at Proove. As one manager wrote in an email in April of 2016 (sent to PER's/research assistants like Rachel Perry): "I refuse to be the person who is continually bringing you bad news. Bottom line is this....Continue to do the great job you are all doing....but please look to make that magic #5 happen on a daily basis." *See* Exhibit E ("magic 5's" email).

45. The Nguyen memo later reiterated, "You will fill out IIE for Dr. Abdollahi," confirming that Dr. Abdollahi never fills out the IIE's that is the purported legal basis of his compensation. Exhibit B.

46. The memo later stated that the process was virtually identical for Dr. Wang. *Id.*

COMPLAINT

47. In summary, it became clear to Ms. Perry that doctors Abdollahi and Wang, and likely the other Proove doctors, were being paid kickbacks for ordering Proove's tests. Ms. Perry knows this firsthand because she is tasked with completing the "research work" that supposedly justified the doctors' compensation.

48. All of Ms. Perry's communications and correspondence with Proove management and other Patient Engagement Representatives confirms her belief that Proove employees perform substantially all of the "research work" for which Proove is paying its doctors.

49. To try to cover up these anti-kickback violations, Proove also directed its Patient Engagement Representatives to fill out timesheets, called OTR's (Official Time Records) that purported to document the time that the doctors spent "performing researching services.'" *See e.g.* Exhibits F, G (OTR's).

50. Proove specifically instructed its employees to "vary" "time patterns" in the OTR's in order to avoid scrutiny. As an email sent in September of 2016 stated, "Time patterns cannot be on the otr, I've been seeing a lot of 15 minutes consistently and they need to vary and range. Time patterns, consistency, and high times on a daily otr sheets can result in rejection, as you may know not all patients spend the exact same time as other patients. Time usually range from 5-18 minutes. Please make sure the times vary for every patient and are not consistent. Example: 8, 2, 9,15,13,10, etc." *See* Exhibit H.

51. Similar emails instructed PER's on how to fill out the IIE's, further demonstrating Proove's knowledge that doctors were not filling out these reports, and that they were not compensating them for "research fees." *See* Exhibit I.

52. These documents were sent in "OTR Envelopes" along with the IIE's described above. Proove directed its employees to submit these documents "to make sure we do not hold up any payments for your doctors." *See* Exhibit J.

53. But the timesheets and OTR packets were also false.

54. The OTR's did not accurately describe the time that the doctors spent. In reality, the doctors spent little if any time on "research services" and Proove employees were directed to falsify the OTR's to give the appearance that the payments were not kickbacks.

### C. False Claims of Medical Necessity.

55. Ms. Perry also learned that Proove and its co-conspirator doctors make false claims to Medicare about the medical necessity of the genetic tests. Proove and the doctors falsely claim (and certify to Medicare) that these genetic tests are only ordered when medically necessary and clinically indicated.

56. But again, the Nguyen memorandum proves otherwise. The memo demonstrates that Proove and Dr. Abdollahi expected Ms. Perry to obtain genetic testing for every single Medicare patient over 18 years old: "If over 18 years old with PPO or Medicare, *you will swab them*," it stated (emphasis provided).

57. The fact is, these tests are largely useless medically. There is no sound scientific support for the tests. The test results are often internally inconsistent, stating within the same document that patients should and should not be prescribed certain drugs; that patients do and do not metabolize drugs deficiently; and that the same drugs should and should not be used with extra caution. *See e.g.,* Exhibit K.

58. Doctors Abdollahi and Wang, and on information and belief, Dr. Gillman, do not use the results of Proove's genetic tests to improve care for their patients. As discussed above, to the extent that "research papers" document any medical use of the genetic tests, those papers are prepared by Proove employees, not the doctors themselves.

59. For example, patient D. Deshaies received genetic testing from Proove on May 11, 2016. *See* Exhibit K.

60. She received, *inter alia*, the tests labeled PBIO1, PBIO2, PBIO4, and PBIO6 through PBIO21. *Id.* at 1-2.

61. The results of these tests were contradictory and internally inconsistent.

62. Ms. Deshaies' "Non Opiod Response Profile," identified as PBIO11, claims that she is "likely a poor responder" to medications such as ibuprofen, gabapentin, and alprazolam. *Id.* at 26.

63. But Ms. Deshaies' "Drug Metabolism Profile," identified as PBIO2, states that she is a normal metabolizer of those medications and instructs that they can be prescribed normally. *Id.* at 9-11.

64. Other tests were similarly inconsistent and contradictory.

65. Ms. Deshaies' "Opiod Response Profile," identified as PBIO5, claims that she is "likely a poor responder" to medications such as oxycodone, morphine, and hydrocodone. *Id.* at 23.

66. But the PBIO2 states that Ms. Deshaies can metabolize those medications normally and instructs that they can be prescribed normally. *Id.* at 9.

67. These inconsistencies and contradictions are also present in Proove's alleged enzyme testing.

68. Despite the PBIO5 and PBIO11 findings that Ms. Deshaies would respond poorly to ibuprofen, oxycodone, alprazolam, and hydrocodone, among others, the PBIO2 shows that she could normally metabolize the enzymes associated with those medications, including CYP2C9, CYP2D6, and CYP3A4. *Id.* at 18-19.

69. The PBIO2 also claims that Ms. Deshaies can normally metabolize VKORC1, the enzyme associated with the medication Warfarin, even though the same report places that medication in the "Caution" category and claims that "this patient may require an increase in the standard maintenance dose of Warfarin." *Id.* at 15, 19.

70. These inconsistencies and contradictions also existed in the enzyme test results for other patients.

71. For example, Khadijeb Khatib, a Medicare patient, underwent Proove's testing on or about November of 2016. *See* Exhibit L.

72. Ms. Khatib's PBIO2 claims the she can metabolize the medication Warfarin properly and that it should be "prescribed with standard precautions." *Id.* at 15.

73. But the same PBIO2 also claims that Ms. Khatib is "deficient" in metabolizing the Warfarin enzyme VKORC1. *Id.* at 21.

74. Ms. Khatib's PBIO2 also shows inconsistencies and contradictions for other medications and their enzymes, such as buprenorphine and CYP2C8, ibuprofen and UGT2B7, and carisoprodol and CYP2C19. *Id.* at 9-21.

75. The inconsistencies and contradictions also existed in tests performed on the same patient on different dates.

76. For example, patient E. Whitaker underwent Proove's testing on or about August-September and December of 2015. *See* Exhibit M.

77. Mr. Whitaker's PBIO11 from September showed him to be a "likely poor responder" to ibuprofen. *Id.* at 22.

78. But his PBIO11 from December found him to be a "likely good responder" to the same medication. *Id.* at 25.

79. And the inconsistencies continued in Mr. Whitaker's enzyme analysis as well.

80. Mr. Whitaker's PBIO2 from August of 2015 showed him to properly metabolize the enzyme UGTB7. *Id.* at 8.

81. But his PBIO2 from November of 2015 showed that to be a "compromised metabolizer." *Id.* at 20.

82. These contradictory and inconsistent tests are only representative of the false and fraudulent claims of medical necessity made by defendants. Plaintiff alleges and includes all similar tests made from at least June of 2015 and continuing through the present day as additional acts of this medical necessity fraud. On information and belief, these practices were applied by all or substantially all doctors in the Proove network nationwide.

12

COMPLAINT

### D. Fraudulent "Unbundling" of Services.

83. Defendants also engage in the fraudulent "unbundling" of billing for lab tests that was performed on or near the same period of time.

84. For example, a patient will get a cheek swab, and doctors will order a variety of tests, including but not limited to "Proove Opoid PBIO1"; "Proove Drug Metabolism, PBIO2"; "Proove Pain Perception, PBIO4"; Proove NSAID Risk PBIO17" to be run from the same swab.

85. Proove will have all of results of these tests within two weeks of the swab on average.

86. But Proove will then falsify the dates of treatment for the different tests, claiming falsely that they were performed on different days.

87. This practice has the effect of impermissibly multiplying the compensation that Proove receives for treatment that all occurred from one cheek swab on one day.

88. For example, patient R. Moore visited Dr. Abdollahi's office on September 21, 2016, and received a cheek swab to undergo Proove's testing. *See* Exhibit N at 1.

89. Mr. Moore received the tests identified as PBIO1, PBIO2, PBIO4, PBIO5, PBIO6, PBIO7, PBIO8, PBIO11, PBIO17, PBIO18, PBIO21, PBIO25, among others. *Id.* at 8-10.

90. Proove completed and returned the test results by October 3, 2016, as shown by the "Proove Summary View," a report that summarizes the results of every test performed on Mr. Moore. *Id.*

91. But Proove later created individual test reports alleging "Dates of Service" other than September 21, 2016, as if most of the tests had been run on different dates. *Id.* at 12-44.

92. Defendants ultimately submitted a claim for $2,599.00 for the testing performed on September 21, 2016, and submitted additional claims for tests dated

October 21 through October 28, 2016, despite no tests or services being provided on those dates. *Id.* at 2-3.

93. The same fraudulent "unbundling" was used with patient E. Krueck.

94. Mr. Krueck visited Dr. Abdollahi's office on August 25, 2016, and received a cheek swab to undergo Proove's testing. *See* Exhibit O at 1.

95. Mr. Krueck's sample underwent the tests identified as PBIO1, PBIO2, PBIO4, PBIO6, PBIO7, PBIO8, PBIO12, PBIO18, PBIO21, PBIO25, among others. *Id.* at 8-10.

96. Proove completed and returned the tests results by September 1, 2016, as shown in Mr. Moore's "Proove Summary View." *Id.*

97. But Proove later created individual test reports alleging "Dates of Service" other than August 25, 2016, as if most of the tests had been run on different dates. *Id.* at 12-46.

98. Defendants submitted a claim for the tests performed on August 25, 2016, and submitted additional claims for tests dated September 24 through September 29, 2016, despite no tests being provided on those dates. *Id.* at 2-7.

99. This "unbundling" of the services provided to Mr. Moore and Mr. Krueck is only representative of the billing fraud engaged in by defendants. This practice was also used in claims submitted to Medicare and, on information and belief, was applied by all or substantially all doctors in the Proove network nationwide.

E. **Ms. Perry's status as an "original source."**

100. In the fall of 2016, Ms. Perry reported the fraud that she witnessed to the government. She used an online fraud reporting hotline to advise the government about her concerns, but she did not receive a response.

101. In November of 2016, Ms. Perry sent an email to directly to an employee at the U.S. Department of Justice. She wrote "I'm reaching out to anyone I can find direct contact info for in the OIG at HHS, Medicare, DOJ, or FBI, in order to discuss a fraudulent company in the healthcare industry (which I still currently

work for). I've spent the last few weeks and months compiling evidence against them, and have a lot, but would like to discuss what kind of specifics are needed/if I'm gathering more than is necessary." Exhibit P. She continued, "Two of the biggest things are fraudulent billing with Medicare and private insurance companies (billing for additional dates of service that patients were never seen), and violating the Anti-Kickback Statute by paying doctors for the testing (which the testing in itself is fraudulent and not sound science, and the doctors rarely use it in their practice). The patients tell me all the time that the testing is irrelevant and not accurate and they're angry that we billed their insurance for an ungodly amount of money. I can elaborate on all of this later, and this is just the tip of the iceberg." *Id.*

102. She did not receive a response.

103. In December of 2016, Ms. Perry read a newspaper article by an investigative reporter who was investigating in a general way Proove's claims about its genetic testing. She contacted the reporter, and advised him that he that he had not begun to scratch the surface of Proove's fraud. In an effort to bring Proove to justice, and after her earlier reports to the government received no response, she provided the reporter with some similar information to what is described in this complaint. She did so anonymously for purposes of attribution in the article. Again, she only did so after failing to receive a response from her earlier whistleblowing, and in the hopes of stopping Proove's unlawful practices.

104. Afterwards, Ms. Perry again reached out to the government through a fraud hotline. This time, she received a response from both agents of the Officer of the Inspector General and from an F.B.I. agent.

105. Ms. Perry met with the government agents on or about February 24th, 2017, and voluntarily disclosed her knowledge of the fraud being committed by Proove and the other doctors.

106. On February 27th, 2017 (approximately three days after Ms. Perry met with the government) the investigative reporter that Ms. Perry spoke to earlier published an article that described at least some of the allegations that are set forth in this complaint. By the contents of the article, it appears that Ms. Perry contributed the lion's share of the information that ended up in the February 27th publication.

107. Ms. Perry had direct and independent knowledge of the information disclosed in the February 27th article. She has direct and independent knowledge of the information on which the allegations in this complaint are based.

108. Her knowledge preceded the public disclosure of that information.

109. Both before and after the February 27th article, and prior to the filing of this lawsuit, Ms. Perry voluntarily disclosed all of the relevant information to the government. Specifically, Ms. Perry has had multiple meetings and conversations with OIG agent Mike Phelps, and with FBI Agent Leah Chambers. Ms. Perry also provided all of the documents that could potentially be useful to the government by and through delivery to Assistant United States Attorney Josh Green, who is working with agents Phelps and Chambers on this matter.

110. Ms. Perry is thus an "original source" for purposes of the "public disclosure" rule for qui tam complaints. *Cf. United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015).

## CAUSES OF ACTION

111. Plaintiff brings the following claims under 31 U.S.C. § 3730 *et seq.*, the False Claims Act:

16

COMPLAINT

### I. Count One: Illegal kickbacks to doctors and resulting false claims to Medicare.

112. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in this Complaint.

113. Federal law prohibits the payment or receipt of remuneration in return for referring an individual to a healthcare providers who charges the United States for any portion of the services provided to that person. *See e.g.* 42 U.S.C. § 1320a-7b(a).

114. Defendants violated anti-kickback statutes insofar as Proove paid doctors—including but not limited to Drs. Abdollahi, Wang, and Gillman—to entice them to order Proove's genetic tests. Both Proove and the doctors knew that Proove was not paying the doctors for "research" time, because it was Proove employees like Rachel Perry who were performing these tasks on the doctors' behalf.

115. Healthcare providers who bill Medicare for services rendered certify, either explicitly or impliedly or both, that they are in compliance with rules and regulations governing Medicare billing—including the anti-kickback statutes and Stark laws described above.

116. By making these explicit and/or implied certifications despite knowingly violating anti-kickback and Stark laws, all defendants made false and fraudulent claims to the United States; presented the claims to the United States for payment or approval; and did so knowing that the claim was false or fraudulent, all in violation of 31 U.S.C. § 3729(a)(1).

117. The United States has been damaged as a result of this unlawful conduct.